THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PATIENT ACCOUNTING          :
SERVICE CENTER, LLC, d/b/a   :
GETIX HEALTH, LLC,           :
                             :     3:22-CV-1170
            Plaintiff,       :     (JUDGE MARIANI)
      v.                     :
                             :
BETH M. EBLING, et al.,      :
                             :
            Defendants.      :

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

Presently before the Court is Plaintiff's Motion for Temporary Restraining Order and a Preliminary Injunction (Doc. 8).[1]

On July 27, 2022, Plaintiff, Patient Accounting Service Center, LLC, d/b/a GetixHealth, LLC, (hereinafter "Getix" or "GetixHealth") filed a Complaint against its former employees, Beth Ebling and Jamie Messer, Ebling's domestic partner Bradley Mullen, and Client First RCM, LLC (hereinafter "Client First"), asserting Breach of Duty of Loyalty (Count I) and Breach of Contract (Count II) by Ebling and Messer, and Tortious Interference with Contract (Count III), Tortious Interference with Economic Expectation (Count IV), Unjust

---

[1] The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).  The amount in controversy exceeds $75,000 and complete diversity exists as the plaintiff, GetixHealth, is a Washington limited liability company with a principal place of business in Texas, the individual defendants are all citizens of Pennsylvania, and Defendant Client First is a Pennsylvania limited liability company, with a principal place of business in Pennsylvania.

Enrichment (Count V), and Conspiracy (Count VI) by all defendants.  Plaintiff thereafter filed

a Motion for Temporary Restraining Order and a Preliminary Injunction (Doc. 8) and brief in

support of the motion (Doc. 10), to which Defendants filed a brief in opposition (Doc. 18)

and Plaintiff filed a Reply (Doc. 19).  Plaintiff's Motion requests the following relief:

1. Immediately cease and refrain from, either directly or indirectly, for themselves, or through, on behalf of, or in conjunction with any other person, persons, partnership, or corporation, using, possessing, copying, distributing in any manner whatsoever any of GetixHealth's Confidential Information or any other data, information, knowledge or know-how copied or derived from GetixHealth or taken by Defendants from GetixHealth;

2. Immediately cease and refrain from, either directly or indirectly, for themselves, or through, on behalf of, or in conjunction with any person, persons, partnership, or corporation holding themselves out as former employees of GetixHealth or advertising any services offered by Defendants as derived from or otherwise associated with GetixHealth or GetixHealth's confidential information or materials;

3. Immediately cease and refrain from, either directly or indirectly, for themselves, or through, on behalf of, or in conjunction with any person, persons, partnership, or corporation soliciting any of GetixHealth's current customers;

4. Submit to a forensic evaluation of their electronic devices to identify all documents, files, or other data copied or otherwise derived from GetixHealth and to permanently return or delete all information obtained from GetixHealth's computer files and all information obtained from any other GetixHealth files; and

5. Immediately cease and refrain from, either directly or indirectly, for themselves, or through, on behalf of, or in conjunction with any person, persons, partnership, or corporation, misrepresenting or disparaging GetixHealth or any services offered by GetixHealth.

(Doc. 8).

On August 25, 2022, the Court held an evidentiary hearing on Plaintiff's Motion for Temporary Restraining Order and a Preliminary Injunction.

Plaintiff's motion having been fully briefed and a preliminary injunction hearing having been held, the motion is now ripe for disposition. For the reasons that follow, Plaintiff's motion for preliminary injunctive relief will be denied.

## II. FINDINGS OF FACT

1. Laurie Fenstermacher is currently the Provider Enrollment Manager at GetixHealth. She has been in this position for the last 20 years. (Test. of Fenstermacher, Off. Hr'g Tr., Doc. 24, at 12).

2. Fenstermacher worked with Messer and Ebling from the time the defendants were hired. (*Id.* at 12-13). Fenstermacher is familiar with both Messer and Ebling's job duties in their respective positions at Getix. (*Id.* at 13).

3. When Messer left Getix in 2022, she was a Billing Operation Manager. (Test. of Fenstermacher, Off. Hr'g Tr., Doc. 24, at 13). This required her to oversee all of the account managers, help manage workflow, answer questions and work out client and staff issues and problems. (*Id.* at 31).

4. In her last year at Getix, Messer worked with "twenty or more" clients. (*Id.*). Messer had regular contact with clients. (*Id.* at 31-32).

5. Ebling's job title at the time she left Getix in 2022 was Manager of Accounts Receivable. (Test. of Fenstermacher, Off. Hr'g Tr., Doc. 24, at 13). Ebling's job

3

duties included pulling the work flows for her team to work, managing "a few" clients, running reports for her team and for clients, and problem-solving when there were issues getting claims paid. (*Id.* at 33-34). Ebling would have contact with the clients she managed. (*Id.* at 34).

6. Ebling signed a "Confidentiality and Non-Disclosure Agreement" on September 16, 2016. (Hr'g Ex. P-1).

7. In December of 2019, both Messer and Ebling signed an "Employee Non-Disclosure Agreement." (Hr'g Ex. P-1; Hr'g Ex. P-2). This Agreement includes sections governing the scope of the agreement, definitions of confidential information, exclusions thereto and the period of confidentiality, and proprietary rights and security policies and procedures. (*Id.*).

8. The non-disclosure agreement defines "confidential information" as follows:

> . . . any material, knowledge, information and data (verbal, electronic, written or any other form) concerning the Company or its businesses not generally known to the public consisting of, but not limited to, inventions, discoveries, plans, concepts, designs, blueprints, drawings, models, devices, equipment, apparatus, products, prototypes, formulae, algorithms, techniques, research projects, computer programs, software, firmware, hardware, business, development and marketing plans, merchandising systems, financial and pricing data, information concerning investors, customers, suppliers, consultants and employees, and any other concepts, ideas or information involving or related to the business which, if misused or disclosed, could adversely affect the Company's business. . . .

(*See* Employee Non-Disclosure Agreement, Art. II (A)).

4

9. The non-disclosure agreement provides exclusions to the definitions of confidential information if the information was publicly known or approved for release by the Employer through written authorization. (*See id.* at Art. II (B)).

10. Messer and Ebling also both signed an "Acknowledgment and Receipt for Employee Handbook" on July 23, 2021. (Hr'g Ex. P-4).

11. The Handbook includes a company policy regarding "Computer & Electronic Media", which contains sections addressing, in relevant part, "Authorization and Security", "Hardware and Software Removal or Disposal", and "Political, Personal or For-Profit Use". (*Id.*).

12. The Handbook also includes a company policy governing "Conflict of Interest". (Hr'g Ex. P-4). The policy explains that "a potential conflict of interest occurs when an employee's outside interests (for example, financial or personal interests) interfere with GetixHealth's interest or the employee's work-related duties." (*Id.*).

13. Getix clients are all physician groups and facilities. Fenstermacher described Getix's business as follows:

> We're a Revenue Cycle Management Company. Providers see patients and we process the billing slips and send out the claims electronically. Then we post charges and payments and also do accounts receivable follow-up, when claims are not paid. We also balance bill the patients for the balance due.

(Test. of Fenstermacher, Off. Hr'g Tr., Doc. 24, at 14).

14. In January, 2022, Getix had "around" 66-68 clients in Pennsylvania. (Test. of Fenstermacher, Off. Hr'g Tr., Doc. 24, at 14). As of August 25, 2022, Getix has approximately 52-55 clients in Pennsylvania. (*Id.* at 14-15).

15. Since 2009, Getix has a policy of maintaining its documents and information electronically. (*Id.* at 15). According to Fenstermacher, this means that everything is scanned and kept in a shared file and on a server. (*Id.* at 16). To access the shared file or drive, an employee must log in with his/her personal log-in and password provided by Getix's IT Department. (*Id.* at 18-19).

16. Getix employees are allowed to print documents for their job duties, but the company "encourage[s] paperless." (Test. of Fenstermacher, Off. Hr'g Tr., Doc. 24, at 16).

17. According to Fenstermacher, the following information is needed when Getix brings in a new client:

> The billing name, which is registered as a tax I.D. name, the national provider group number, which is registered with the provider's group, the address, pay-to address, list of insurance carriers that they currently participate in, address they see patients, hospitals they go to, and along with Provider Enrollment data, like their CVs, Board certificates, license, DEA, things like that.

(*Id.* at 22). Fenstermacher testified that it takes an average of two to four weeks to place all the information into the system, but depending on the insurance carriers, it may take several additional weeks to set up the client's medical billing. (*Id.* at 22).

18. Getix uses UMED and Getix SoftPro to post its accounts receivable and payments. (Test. of Fenstermacher, Off. Hr'g Tr., Doc. 24, at 25).

19. Getix uses the "EDI clearing house Trizetto" to handle client billing.  (*Id.* at 40).

20. Getix maintains a client list.  (*Id.* at 41). The list is stored in Modeo, a credentialing software database that Getix has a license to use.  (*Id*. at 44). The list is not accessible to anyone outside of Getix and an employee needs a log-in name and password to access the client list.  (*Id*. at 44).

21. On April 11, 2022, Messer sent an email formally resigning effective April 22, 2022. (Hr'g Ex. P-5A).  Messer's last day at Getix was April 22, 2022.  (Test. of Messer, Off. Hr'g Tr., Doc. 24, at 114).

22. On April 24, 2022, Ebling provided Getix's Human Resources notice of her formal resignation effective May 6, 2022.  (Hr'g Ex. P-5).  Ebling's last day was May 6, 2022.  (Test. of Ebling, Off. Hr'g Tr., Doc. 24, at 120).

23. Ebling and Messer continued to work on client work after submitting their resignations and retained the same access to Getix information and documents as they had prior to their resignations. (Test. of Fenstermacher, Off. Hr'g Tr., Doc. 24, at 35).

24. Ebling and Brad Mullen, Ebling's domestic partner, decided to form Client First in March of 2022.  (Test. of Ebling, Off. Hr'g Tr., Doc. 24, at 136).

25. Mullen is the only owner of Client First.  (Test. of Ebling, Off. Hr'g Tr., Doc. 24, at 120; Test. of Messer, Off. Hr'g Tr., Doc. 24, at 115).

26. Client First registered its domain name, ClientFirstRCM.com on April 12, 2022.  (Hr'g Ex. P-6).

7

27. Fenstermacher first learned about Client First in early July, 2022 when she saw an
    email indicating that Valley Physical Therapy, a client of Getix who terminated the
    company's services in late-April/early-May, had submitted a change request for the
    National Provider Identifier listing the new contact person as Jamie Messer at Client
    First.  (Test. of Fenstermacher, Off. Hr'g Tr., Doc. 24, at 36-37).

28. Fenstermacher admitted that she does not have any documents demonstrating that
    Ebling printed any Getix confidential information prior to leaving Getix.  (*Id.* at 95-96).

29. At the evidentiary hearing, Plaintiff introduced a print log listing all of Messer's
    printing activity from January 1, 2022 through July 1, 2022.  (Hr'g Ex. P-7).

30. In relevant part, the print log shows the following documents were printed:

    a.  January 25, 2022: "how-to guides"/"standard operating procedures"
        documents created in Microsoft Word for approximately 50 Getix clients (*id*. at
        20-23);

    b.  March 2, 2022: "how-to guides"/"standard operating procedures" documents
        for 13 Getix clients (*id*. at 31, 33) and a Microsoft Word document entitled
        "How to run reports" (*id*. at 33);

    c.  March 7 and March 28, 2022: "Client List Updated 1.10.22 xlsx" both in its
        entirety and portions thereof (*id*. at 37, 47);

    d.  April 15, 2022: approximately 70 sets of Optum Encoder Pro.com
        Professional CPT Codes (*id*. at 53-57);

8

   e.  April 20, 2022: Accounts Receivable ("AR") forms for 4 Getix clients (*id*. at 62);

   f.  April 21, 2022: procedure book for Valley Physical Therapy (*id*. at 63).

31. The "how-to guides"/"standard operating procedures" documents are used by Getix

   employees when working in accounts receivable and explain "what you should do,

   how do you fix claims, how do you get them paid, [and] procedure notes of how to

   bill it." (Test. of Fenstermacher, Off. Hr'g Tr., Doc. 24, at 51). Each client has a

   separate guide setting forth that client's billing procedures. (*Id*. at 52, 55-56). The

   guides are created by Getix employees and updated regularly. (*Id*. at 54-55, 59).

32. Fenstermacher testified that she and Ebling created the "how to run reports"

   document as a guide to help run month end reporting packages for clients and how

   to teach other Getix employees how to run basic reports. (Test. of Fenstermacher,

   Off. Hr'g Tr., Doc. 24, at 63-64).

33. Although Fenstermacher testified that she did not believe that Messer needed to

   print the client list in order to perform her job, Fenstermacher explained that this was

   because "we're paperless, we should use our screens for everything." (*Id.* at 49).

   There was no testimony that Messer's job did not require her to have regular access

   to the client list or that Messer did not need the client list to properly perform her job

   duties. Instead, Fenstermacher admitted that both Messer and Ebling would have to

   access the Getix client list when doing their jobs. (*Id.* at 102).

34. Getix buys a license from Optum Encoder Pro "to give the staff the ability to look up, by CPT code, the rules and regulations pertaining to that CPT code, diagnoses that would be payable, like, for medical necessity, if it can be billed together with another procedure, like a surgery."  (Test. of Fenstermacher, Off. Hr'g Tr., Doc. 24, at 65).

35. Getix did not create the code sections or the information set forth in the Optum Encoder Pro program.  (*Id.* at 65).  Rather, CPT codes are public, can be obtained from several online sources, and are used by all insurance carriers. (*Id.* at 82-83; *see also*, Test. of Messer, Off. Hr'g Tr., Doc. 24, at 161).

36. Encoder Pro software is used by various medical billers. (Test. of Fenstermacher, Off. Hr'g Tr., Doc. 24, at 85).

37. Messer admitted that she printed the documents set forth in the Getix print log (Hr'g Ex. P-7) and explained the majority of the documents were printed as part of her "daily job".  (Test. of Messer, Off. Hr'g Tr., Doc. 24, at 155; *see also, id.* at 155-158). Messer nonetheless admitted that she printed the Encoder Pro chapters/codes because she could utilize them at the new job she had just accepted at Gym Jam. (Test. of Messer, Off. Hr'g Tr., Doc. 24, at 171).

38. Approximately 13 clients have terminated with Getix since April 15, 2022. Specifically, Fenstermacher identified the following Getix clients:

    a.  Valley P.T.;
    b.  Mainline Founders;
    c.  Dr. Harris;
    d.  Suburban Ortho;

e. Amy Fitzsimmons;
f. Dr. Freed;
g. Rheumatology Care Center;
h. Columbia;
i. McShane Sports Medicine;
j. DiNubile
k. Dr. Albornoz;
l. Regional Orthopedics;
m. Dr. Baio.

(Test. of Fenstermacher, Off. Hr'g Tr., Doc. 24, at 73-75). The "how-to guides"/ "standard operating procedures" for these clients, with the exception of Valley P.T., were among the approximately 50 guides printed by Messer on January 25, 2022. (*See* Hr'g Ex. P-7, at 20-22). The "how-to guide"/"standard operating procedures" for Valley P.T. was printed by Messer on March 2, 2022. (*Id*. at 31).

39. Fenstermacher has never spoken with anyone at Valley P.T. about the reason the practice terminated Getix. (Test. of Fenstermacher, Off. Hr'g Tr., Doc. 24, at 74).

40. Fenstermacher has spoken with Dr. Vernace, Dr. Freed, and Colleen McShane since they terminated with Getix. (*Id*. at 76, 103). She did not discuss any change in the client support teams with any of these providers or discuss outsourcing or off-shoring with them, but did discuss the fact that Getix was going remote in Pennsylvania. (*Id*. at 76-77).

41. Fenstermacher admitted that she knew that Messer was someone who liked to work with physical, as opposed to electronic documents, and that Messer would regularly use the printer. (*Id.* at 93-94).

11

42. Fenstermacher never personally saw Messer or Ebling remove physical documents from Getix.  (Test. of Fenstermacher, Off. Hr'g Tr., Doc. 24, at 93).

43. Fenstermacher also admitted that she has no personal knowledge that Messer or Ebling physically took any Getix procedure manuals or books from the office. (*Id.* at 96).

44. Fenstermacher has no personal knowledge that Messer or Ebling contacted Getix clients after they ended their employment at Getix.  (*Id.* at 103).

45. Messer denied taking any electronic documents with her when she left Getix. (Test. of Messer, Off. Hr'g Tr., Doc. 24, at 160).  However, Messer admitted that she removed certain physical documents when she left Getix, and specifically, documents containing CPT codes and an Adaptive Behavior Assessment document obtained as a result of a Google search. (*Id.* at 160-164). Ebling confirmed that she and Messer have the Optum Encoder Pro Professional CPT Codes that Messer printed while working at Getix.  (Test. of Ebling, Off. Hr'g Tr., Doc. 24, at 148, 150).

46. Messer denied taking any Getix operating manuals, AR Reports, written procedures, client revenue reports, billing guidelines, or reference documents.  (Test. of Messer, Off. Hr'g Tr., Doc. 24, at 165).

47. Messer also testified that she did not solicit any business from clients of Getix and denied discussing Getix's practices or business plans with any third party. (Test. of Messer, Off. Hr'g Tr., Doc. 24, at 166-167).

48. Ebling denied taking any physical Getix documents from Getix either prior to, or on the last day of, her employment there. (Test. of Ebling, Off. Hr'g Tr., Doc. 24, at 137). She further denied downloading or taking any electronic versions of any Getix documents or using any Getix confidential or internal documents to set up or operate Client First. (*Id.* at 137-138).

49. Ebling also denied ever discussing Getix's billing processes, Getix's offices in India, Getix's internal initiatives, billing models, or growth strategies or plans with any third parties or former Getix clients. (*Id.* at 140-141).

50. Ebling never personally contacted any of the former Getix clients that are now Client First clients to solicit their business, nor did she direct any Client First employee or third-party to do so. (*Id.* at 141).

51. Ebling currently works at Client First as an Accounts Receivable Manager. (Test. of Ebling, Off. Hr'g Tr., Doc. 24, at 120). Her first day at Client First was May 9, 2022. (*Id.*). Ebling was the first Client First employee. (*Id.*).

52. Messer currently works at Client First in Revenue Cycle management. (Test. of Messer, Off. Hr'g Tr., Doc. 24, at 113). She began working at Client First either the first or second week of May, 2022. (*Id.* at 114).

53. After Messer submitted her resignation, she was approached by Ebling and asked if she would help Ebling on an accounts receivable project. (Test. of Messer, Off. Hr'g

Tr., Doc. 24, at 114).  Messer never spoke to Ebling or Mullen about working at Client First prior to her departure from Getix.  (*Id.* at 116, 153).

54. Client First was operational by the end of May, 2022.  (Test. of Messer, Off. Hr'g Tr., Doc. 24, at 119).

55. Client First's first client was Melnick, Moffitt and Mesaros.  (Test. of Ebling, Off. Hr'g Tr., Doc. 24, at 121).  According to Ebling, this client "was why the company was formed." (*Id.*).  This group signed the contract to work with Client First during the first week of May, prior to Ebling joining Client First. (*Id.*).

56. Client First signed its first Getix client, Valley Physical Therapy, at the end of May, 2022.  (Test. of Ebling, Off. Hr'g Tr., Doc. 24, at 120-121; Test. of Messer, Off. Hr'g Tr., Doc. 24, at 154).

57. Client First currently has 4 employees: Ebling, Messer, Joy Heffner, and Deb Davidson.  All of Client First's employees are former Getix employees.  (Test. of Messer, Off. Hr'g Tr., Doc. 24, at 116-117).

58. Client First currently has 14 clients:

    a.  Valley Physical Therapy
    b.  Neshaminy Valley Chiropractic
    c.  Melnick, Moffitt and Mesaros
    d.  Mainline Orthopedics
    e.  Dr. Glenn Freed
    f.  Dr. Marco Albornoz
    g.  Dr. Baio
    h.  Dr. McShane
    i.  Suburban Orthopedics
    j.  PA Regional

    k.  Gym Jam Therapeutics
    l.  Atlantic Orthopedics
    m. Achieva Rehabilitation

(Test. of Messer, Off. Hr'g Tr., Doc. 24, at 116-118).[2]

59. Of these Client First clients, the following 10 practices were previously clients of

Getix: Valley Physical Therapy; Mainline Orthopedics; Dr. Freed; Dr. Albornoz; Dr.

Baio; Dr. McShane; Suburban Orthopedics; PA Regional; Atlantic Orthopedics; and

Achieva Rehabilitation.  (Test. of Messer, Off. Hr'g Tr., Doc. 24, at 117-118).

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 65 governs the issuance of a preliminary injunction.[3]

In ruling on a motion for a preliminary injunction, the Court must consider: "'(1) the likelihood

that the moving party will succeed on the merits; (2) the extent to which the moving party

will suffer irreparable harm without injunctive relief; (3) the extent to which the non-moving

party will suffer irreparable harm if the injunction is issued; and (4) the public interest.'"

*McNeil Nutritionals*, *LLC v. Heartland Sweeteners*, *LLC*, 511 F.3d 350, 356-57 (3d Cir.

2007) (quoting *Shire U.S. Inc. v. Barr Labs. Inc.*, 329 F.3d 348, 352 (3d Cir. 2003)).

When requesting preliminary equitable relief, the movant "must meet the threshold

for the first two 'most critical' factors: it must demonstrate that it can win on the merits

---

[2] Although Messer stated that Client First has 14 clients, the record only reflects the names of 13 of these clients.

[3] The standard for granting a preliminary injunction under Rule 65 is the same as that for issuing a TRO.  *Pileggi v. Aichele,* 843 F.Supp.2d 584, 592 (E.D. Pa. 2012) (citing *Bieros v. Nicola,* 857 F.Supp. 445, 446 (E.D. Pa. 1994)).

(which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). If these two "gateway factors" are met, a court should then consider the other two factors and determine "in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id*.

"District courts have the freedom to fashion preliminary equitable relief so long as they do so by 'exercising their sound discretion.' . . . Indeed, '[t]he essence of equity jurisdiction has been the power of the [court] to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it.'" *Reilly*, 858 F.3d at 178-179 (internal citations omitted).

## IV. ANALYSIS AND CONCLUSIONS OF LAW

### A. Plaintiff's Likelihood of Success on the Merits

Plaintiff asserts a likelihood of success on the merits as to each of the six counts set forth in its Complaint, specifically, Breach of Duty of Loyalty (Count I), Breach of Contract (Count II), Tortious Interference with Contract (Count III), Tortious Interference with Economic Expectation (Count IV), Unjust Enrichment (Count V), and Conspiracy (Count VI).

### Breach of Contract (Count II)

Plaintiff's Complaint asserts that Defendants Ebling and Messer breached their obligations under the Confidentiality Agreements and "by copying, publishing, disclosing, or

16

permitting others to use GetixHealth's confidential information and methods" and that

Defendants' "scheme" caused Plaintiff to suffer, and continue to suffer, damages.  (Doc. 1,

¶¶ 96, 97).

Because Article VIII of the Confidentiality Agreements signed by Ebling and Messer

in December of 2019 specifies that "[t]his Agreement shall be government in accordance

with the laws of the State of Texas", Plaintiff contends that Texas law applies to its breach of

contract claim.  (Doc. 10, at 18).  Although Defendants urge this Court to instead apply

Pennsylvania law (Doc. 18, at 13), the Court need not engage in a choice of law analysis.

As Plaintiff properly concedes, "the elements for breach of contract in Pennsylvania

mirror those of Texas" and therefore "the result would be the same if Pennsylvania law

applied."  (Doc. 10, at 18 n.1).  Pursuant to Texas law, "[t]he essential elements of a breach

of contract claim are: (1) the existence of a valid contract; (2) performance or tendered

performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages

sustained as a result of the breach."  *Hall v. Lewis*, 639 S.W.3d 197 (Tx. App. 2021).

Similarly, in Pennsylvania, a breach of contract claim requires "(1) the existence of a

contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3)

resultant damages."  *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (citing

*CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).

Under Pennsylvania's choice of law rules, a court must first look to see whether a

true conflict exists, and in the absence of a conflict, the court may apply Pennsylvania law.

*Scirex Corp. v. Fed. Ins. Co.,* 313 F.3d 841, 847 n.1 (3d Cir. 2002). Because, as admitted by Plaintiff, there is no conflict in the breach of contract analyses required by the laws of Texas and Pennsylvania, any differences between the laws of these two states will not affect the outcome of Plaintiff's breach of contract claim.

Here, Plaintiff has failed to carry its burden of presenting sufficient evidence, for purposes of obtaining preliminary injunctive relief, to establish that Ebling or Messer breached the terms of their Confidentiality Agreement.[4]

Although Plaintiff asserts that Defendants "cop[ied] , publish[ed], disclos[ed], or permit[ed] others to use GetixHealth's confidential information and methods" (Doc. 1, ¶ 96), it presented no evidence to support these allegations at the hearing. Instead, the hearing testimony was woefully deficient in setting forth any substantive evidence to support an argument that Ebling and/or Messer violated the terms of their written agreements with Getix. To find otherwise would require this Court to make unjustified inferential leaps based solely on circumstantial evidence.

Here, Plaintiff argues that "Ebling and Messer breached the Confidentiality Agreements when they stole dozens of proprietary and confidential documents and client files – including customer lists, client revenue reports, billing code manuals, standards, operating manuals, and written procedures – from GetixHealth's system and used them to

---

[4] Defendants argue that the Confidentiality Agreements are not valid or enforceable. (*See* Doc. 18, at 12-14). The Court need not address the argument at this time where, even assuming the validity and enforceability of the Agreements, Plaintiff has failed to establish a likelihood of success on the merits.

establish and operate a competing business." (Doc. 10, at 19). However, both Messer and Ebling denied taking any electronic documents from Getix as well as physical documents including Getix operating manuals, AR Reports, written procedures, client revenue reports, billing guidelines, or reference documents. (Test. of Messer, Off. Hr'g Tr., Doc. 24, at 160, 165; Test. of Ebling, Off. Hr'g Tr., Doc. 24, at 137-138). In turn, Plaintiff has offered no evidence to contradict, or place in question, Defendants' statements. At the hearing, Fenstermacher admitted that she never saw Messer or Ebling remove physical documents from Getix and that she has no personal knowledge that Messer or Ebling physically took any Getix procedure manuals or books from the office. (Test. of Fenstermacher, Off. Hr'g Tr., Doc. 24, at 93, 96). She further admitted that she does not have any documents demonstrating that Ebling even printed any Getix confidential information. (*Id.* at 95-96).

With respect to the documents admittedly printed by Messer while employed at Getix, Messer offered a reasonable explanation for her decision to print the documents. Although Fenstermacher explained that "we're paperless, we should use our screens for everything", she acknowledged that Messer liked to work with physical, as opposed to electronic, documents. (Test. of Fenstermacher, Off. Hr'g Tr., Doc. 24, at 49, 93-94). Plaintiff has failed to offer any evidence to show that Messer did not need to print the documents it deems confidential or that she retained these documents after using them for her stated purpose at work. Further, there was no testimony or documentary evidence that

Messer's job did not require her to access or use any of the printed confidential information or that this information was not necessary to properly perform her job duties.[5]

For the afore-stated reasons, Plaintiff has failed to demonstrate that it can win on the merits as to Count II of its Complaint.

Tortious Interference with Contract (Count III) and with
Economic Expectation (Count IV)

Getix's Complaint further alleges Tortious Interference with Contract (Count III) and Tortious Interference with Economic Expectation (Count IV).  (Doc. 1).

Count III alleges that all Defendants "were aware of the contractual relationships between GetixHealth and its customers, including those contracts between GetixHealth and the customers Defendants stole from GetixHealth" and that, while "while still employed by GetixHealth and after resigning, the Defendants Mullen, Ebling and Messer solicited GetixHealth's customers to leave GetixHealth and instead bring their business to the Defendants' new, competing company, Client First." (Doc. 1, ¶¶ 100-101).  Count III further avers that "Defendants conspired to make and continue to make false representations about GetixHealth's business initiatives, client service models, and billing practices to those customers in order to lure them away" and that the defendants "also misused their access to

---

[5] Messer admitted to printing several documents at GetixHealth which she took with her when she left the company, including numerous Encoder Pro chapters/codes and an Adaptive Behavior Assessment document.  None of these documents contained confidential information or referenced Getix.  As testified to at the hearing by both Messer and Fenstermacher, and as seen through the exhibits presented at the hearing, all of this information was available publicly.  While Messer admitted that she "shouldn't have" printed the Encoder Pro CPT documents at work (Test. of Messer, Off. Hr'g Tr., Doc. 24, at 171), this potential lapse of judgment does not equate to a violation of the confidentiality or non-disclosure agreements.

and knowledge of GetixHealth's data and information which they, in turn, stole and used in

conjunction with their false and misleading solicitations of GetixHealth's customers to

tortiously interfere with GetixHealth's contracts with those customers." (*Id.* at ¶¶ 102-103).

Count IV, alleging tortious interference with economic expectation, similarly asserts

that while Ebling and Messer were employed at Getix, but after resignation, these

defendants "intentionally interfered" with Getix's "on-going business relationships, with the

assistance of Mullen, causing a termination of GetixHealth's economic expectancy" and that

the defendants "conspired to make and continue to make false representations about

GetixHealth's business initiatives, client service models, and billing practices to those

customers in order to lure them away." (Doc. 1, ¶¶ 111-112). Getix further alleges that

Defendants also "misused their access to and knowledge of GetixHealth's data and

information which they, in turn, stole and used in conjunction with their false and misleading

solicitations of GetixHealth's customers and tortious interference with GetixHealth's

contracts with those customers." (Doc. 1, ¶ 115).

"Under Pennsylvania law, to prevail on a claim for tortious interference with existing .

. . contractual relationships, a party must prove: (1) the existence of a contractual . . . or

economic relationship between the plaintiff and a third party; (2) purposeful action by the

defendant, specifically intended to harm an existing relationship . . . ; (3) the absence of

privilege or justification on the part of the defendant; [and] (4) legal damage to the plaintiff

as a result of the defendant's conduct. . . ." *Acumed LLC v. Advanced Surgical Servs., Inc.,*

561 F.3d 199, 212 (3d Cir. 2009) (citing *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,*

140 F.3d 494, 530 (3d Cir. 1998)).

Here, Getix has failed to show a likelihood of success on the merits as to Counts III

and IV where it has not presented any evidence that one or more defendant committed any

purposeful action intended to harm an existing relationship.  Specifically, Plaintiff did not

offer evidence that any of the individual defendants contacted one or more Getix clients,

solicited Getix clients, or provided any Getix clients with information deemed confidential by

Getix.  Rather, no evidence was presented at all during the hearing that any of the

defendants even discussed Getix or its business practices with new or potential clients.

Similarly, Plaintiff did not present any evidence that any of the clients who left Getix did so

because of the defendants' actions or because of statements made by the defendants about

Getix.

At the hearing, in addition to failing to set forth any evidence that the defendants took

any physical or electronic confidential information from Getix or utilized any such physical

confidential information following their departures from Getix, Plaintiff did not set forth any

evidence that Messer or Ebling ever orally disclosed confidential information to any third-

party, including to any Getix clients, either during or following their employment at Getix.

Ebling denied ever discussing Getix's billing processes, Getix's offices in India, Getix's

internal initiatives, billing models, or growth strategies or plans with any third parties or

former Getix client. (Test. of Ebling, Off. Hr'g Tr., Doc. 24, at 140-141).  Messer similarly

denied discussing Getix's practices with respect to sending work to its employees in India, Getix's business module strategic plans, or Getix' "vertical" model. (Test. of Messer, Off. Hr'g Tr., Doc. 24, at 166-167).

Nor did Plaintiff produce any specific statement, confidential or not, which any defendant allegedly made to a Getix client or other third-party. The record is devoid of any evidence to support a claim that the defendants made, and continue to make, any representations about Getix, let alone "false representations."

Furthermore, there is no evidence that any defendant solicited Getix customers. Ebling testified that she never personally contacted any of the former Getix clients that are now Client First clients to solicit their business, nor did she direct any Client First employee or third-party to do so. (Test. of Ebling, Off. Hr'g Tr., Doc. 24, at 141). Messer also testified that she did not solicit any business from Getix clients. (Test. of Messer, Off. Hr'g Tr., Doc. 24, at 166-167).

Importantly, Plaintiff offered no evidence at the hearing which contradicts Messer and Ebling's statements. Fenstermacher admitted that she has no personal knowledge that Messer or Ebling contacted Getix clients after they ended their employment at Getix. (Test. of Fenstermacher, Off. Hr'g Tr., Doc. 24, at 103). There was also no testimony that any client or individual was provided with false or misleading information about Getix by the defendants. Fenstermacher specifically stated that she has never spoken with anyone at Valley P.T., the first Getix client who signed with Client First client, about the reason the

23

practice terminated Getix. (Test. of Fenstermacher, Off. Hr'g Tr., Doc. 24, at 74).  Although

Fenstermacher has spoken with Dr. Vernace, Dr. Freed, and Colleen McShane since they

terminated with Getix, Fenstermacher did not discuss any change in the client support

teams with any of these providers or discuss outsourcing or off-shoring with them.  (*Id.* at

76-77, 103).

As such, there is no current basis for a finding that the defendants, either prior to

leaving Getix or after their departures, stole or misused Getix information, solicited Getix's

customers to leave Getix, made false representations about Getix's business initiatives,

client service models, and billing practices to lure customers away, or intentionally interfered

with Getix's on-going business relationships.

Breach of Duty of Loyalty (Count I)

Count I of Plaintiff's Complaint alleges that, although Defendants Ebling and Messer

"owed GetixHealth a duty of loyalty during their employment, including an obligation not to

act in direct competition with GetixHealth's business, take action adverse to GetixHealth's

interests, or act to divert business away from GetixHealth", they "engaged in a scheme of

disloyal behavior to steal GetixHealth's customers" while employed by GetixHealth.  (Doc. 1,

¶¶ 87-88).

"Pennsylvania law dictates that an employee, as the agent of his employer, owes his

employer a duty of loyalty" and specifically, that an agent "refrain from competing with the

principal and from taking action on behalf of, or otherwise assisting, the principal's

24

competitors throughout the duration of the agency relationship, as well as . . . not to use property or confidential information of the principal for the agent's own purpose or those of a third party." *Synthes, Inc. v. Emerge Med., Inc.*, 25 F.Supp.3d 617, 667 (E.D. Pa. 2014) (internal citations omitted).

To prevail on a claim of a breach of fiduciary duty under Pennsylvania law, the plaintiff must establish that "'(1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (2) that the plaintiff suffered injury; and (3) that the agent's failure to act solely for the plaintiff's benefit ... was a real factor in bring[ing] about plaintiff's injuries.'" *Id.* (quoting *McDermott v. Party City Corp.*, 11 F.Supp.2d 612, 626 n. 18 (E.D. Pa.1998)).  Nonetheless, it has long been settled under Pennsylvania law that even during the employee's agency, "the agent may make preparation to compete with the principal upon termination of the agency, although he may not at that time use confidential information or solicit the customers of his employer" and that such a "derogation from the general notion of loyalty is not an actionable breach of fiduciary duty." *United Aircraft Corp. v. Boreen*, 284 F.Supp. 428, 443 (E.D. Pa. 1968).  *See also Spring Steels, Inc. v. Molloy,* 162 A.2d 370, 375 (1960) ("Even before the termination of agency, [the employee] is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein.").

In support of its motion for preliminary injunctive relief, Getix claims that Messer and Ebling "accessed GetixHealth's network for an unauthorized purpose and stole GetixHealth's Confidential Information, then used it to set up a competing business offering the same services as GetixHealth and solicited GetixHealth's customers to leave." (Doc. 10, at 23).  As discussed, *supra*, Plaintiff has not presented any evidence that Messer or Ebling, while employed at Getix, "stole" any confidential information or solicited or contacted Getix clients.  Plaintiff has thus not demonstrated a sufficient likelihood of prevailing on the merits of its claim for a breach of duty of loyalty.

<u>Unjust Enrichment (Count V)</u>

Plaintiff further alleges that "[b]ecause [all] Defendants wrongfully secured the benefit of data, documents, information and GetixHealth's client business, to which they were not entitled, Defendants were unjustly enriched at GetixHealth's expense." (Doc. 1, ¶ 118).

Under Pennsylvania law, "[u]njust enrichment is shown by 'benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.'"  *Filippi v. City of Erie*, 968 A.2d 239, 242 (Pa. Commw. Ct. 2009) (quoting *Wiernik v. PHH U.S. Mortgage Corp.,* 736 A.2d 616, 622 (Pa. Super. 1999)).

Once again, Plaintiff asserts that it is likely to prevail on this claim because it "can show Defendants misappropriated GetixHealth's proprietary materials to divert business

away from GetixHealth, launch and operate Client First, and attract customers to Client

First" (Doc. 10, at 22). For the reasons previously discussed, Plaintiff has failed to support

with evidence any of these allegations and therefore is not entitled to preliminary injunctive

relief on the basis of Count V.

Conspiracy (Count VI)

The final count of Plaintiff's Complaint asserts that Defendants' conduct set forth in

the Complaint "constitutes a combination, conspiracy, and unlawful agreement which had as

its objective the infliction of economic harm and injury upon GetixHealth" and that

"Defendants knew at all times during the planning of and conducting acts in furtherance of

their conspiracy that Ebling and Mullen were acting against the interest of their employer,

GetixHealth, and that Mullen was facilitating the harm caused to GetixHealth through the

formation of Client First." (Doc. 1, ¶¶ 121-122).

It is well-settled that to state a civil action for conspiracy under Pennsylvania law, "a

complaint must allege (1) a combination of two or more persons acting with a common

purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful

purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal

damage. . . Additionally, absent a civil cause of action for a particular act, there can be no

cause of action for civil conspiracy to commit that act." *McKeeman v. Corestates Bank,*

*N.A.*, 751 A.2d 655, 660 (Pa. Super. 2000) (internal citations and quotation marks omitted).

Here, the Court need not engage in an analysis of the afore-stated elements of a civil conspiracy claim under Pennsylvania law.  Rather, Plaintiff's failure to show a likelihood of success on the merits on one or more of their underlying tort claims necessarily precludes success on its conspiracy claim.  *See e.g., Synthes, Inc.*, 25 F.Supp.3d at 735 ("An actionable civil conspiracy must be based on an existing independent wrong or tort that would constitute a valid cause of action if committed by one actor. . .  Ultimately, only a finding that the underlying tort has occurred will support a claim for civil conspiracy.") (internal citations and quotation marks omitted).[6]

## B. Extent to Which GetixHealth will Suffer Irreparable Harm if Injunctive Relief is Denied

As previously stated, when requesting preliminary equitable relief, the movant "must meet the threshold for the first two 'most critical' factors: it must demonstrate that it can win on the merits . . . *and* that it is more likely than not to suffer irreparable harm in the absence of preliminary relief," *Reilly*, 858 F.3d at 179 (emphasis added).  Irreparable harm "must be of a peculiar nature, so that compensation in money alone cannot atone for it." *Opticians Ass'n*

---

[6] In addition, even if Plaintiff had successfully demonstrated a likelihood on the merits of one of its independent civil causes of action, Plaintiff nonetheless has not demonstrated a likelihood of success on the merits of Count VI where Plaintiff has not alleged, nor presented any evidence at the preliminary injunction hearing, that the defendants acted with malice. *See e.g. Bro-Tech Corp. v. Thermax, Inc.*, 651 F.Supp.2d 378, 419 (E.D. Pa. 2009) ("Also necessary to a civil conspiracy claim is proof that the alleged conspiracy acted with the intent to injure the plaintiff – in other words, malice.  It must be shown that the '*sole* purpose of the conspiracy was to injure the plaintiffs.  This necessary proposition is negated by a showing that the acts alleged were done for professional or business benefit.") (internal citations and quotation marks omitted); *Giordano v. Claudio*, 714 F.Supp.2d 508, 534 (E.D. Pa. 2010) ("A showing that an alleged conspirator acted for professional or business benefit will preclude a finding of malice."). *See also, DePuy Synthes Sales, Inc. v. Globus Med., Inc.*, 259 F.Supp.3d 225, 248 (E.D. Pa. 2017) (collecting cases).

*of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990) (citing *Morton v. Beyer*, 822 F.2d 364, 372 (3d Cir. 1987)).  Here, the Court has determined that Plaintiff has failed to meet its burden of demonstrating a sufficient likelihood of prevailing on the merits of any its claims.  Where Plaintiff has not established the likelihood that Defendants appropriated to themselves in any manner, including physical or electronic appropriation, any confidential information, or that Defendants physically or orally disseminated any of Getix's confidential information to third parties, Plaintiff has not shown that it has been irreparably harmed in a manner that would satisfy the second criterion for entitlement to relief.

## V. Conclusion

For the foregoing reasons, the Court finds that Plaintiff has not met its burden with respect to its entitlement to preliminary injunctive relief.  Plaintiff has not demonstrated that it has a likelihood of success on the merits with respect to any of its claims and that it is more likely than not to suffer irreparable harm in the absence of preliminary injunctive relief.[7]  Plaintiff's Motion for Temporary Restraining Order and a Preliminary Injunction (Doc. 8) will therefore be denied.  A separate order follows.

Robert D. Mariani
United States District Judge

---

[7] Because Plaintiff has failed to demonstrate irreparable harm or likelihood of success on the merits, "the Court need not address the last two factors in the preliminary injunction analysis." *Asian-Am. Licensed Beverage Assoc. v. Commonwealth of Pennsylvania*, 2005 WL 3077246, at *7 (M.D. Pa. 2005) (citing *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir. 2000)).  *See also*, *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).